

FILED & JUDGMENT ENTERED
Steven T. Salata

Mar 03 2016

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 12-32462 |
| Redf Marketing, LLC ) | Chapter 11 |
| ) | |
| Debtor. ) | |

**ORDER DENYING REQUEST FOR AN ALLOWED CLAIM**

In this matter, Daniel J. Roselli, a former principal of the debtor, suggests that his payment on a judgment for misappropriation of trade secrets for which he, the debtor, and a number of others were jointly liable entitles him to an allowed claim for contribution in this Chapter 11 bankruptcy. For the reasons stated below, Roselli's motion for an allowed claim must be denied.

**Bridgetree Judgment**

Debtor operated an advertising and marketing agency in Charlotte, North Carolina and was wholly owned by Roselli and his wife. On May 18, 2010, debtor, Roselli, and others were sued by Bridgetree *et al.* in U.S. District Court for misappropriation of trade secrets and conversion. *See Bridgetree, Inc. et al. v. Redf Marketing, LLC, et al.*, Case No. 10-CV-00228. The litigation was both contentious and protracted.

1

In August 2012, after a jury trial before the Honorable Frank D. Whitney, Chief U.S. District Judge, the jury returned the following verdicts: (1) the debtor, Roselli, and three others misappropriated Bridgetree's trade secrets under North Carolina law; (2) as a result of the misappropriation of Bridgetree's trade secrets, Bridgetree incurred $653,292 in damages and was entitled to an additional $25,000 in punitive damages; (3) the debtor, Roselli, and three others were liable to Bridgetree for unfair and deceptive practices under North Carolina law; (4) as a result of those unfair and deceptive practices, Bridgetree was entitled to $1 in damages; (5) the debtor and another, but not Roselli, converted computer files owned by Bridgetree; and (6) for that conversion, Bridgetree was owed $3.5 million.

Bridgetree then requested an award of its attorneys fees incurred in successfully prosecuting, *inter alia*, the misappropriation of trade secrets claim. In an order dated February 5, 2013, Judge Whitney noted that North Carolina law required a finding of willfulness to award attorneys fees for misappropriation of trade secrets. Judge Whitney recounted that in the jury instructions for punitive damages, he directed the jury that "You are to answer this question only if you determine that the misappropriation of a trade secret was *willful and malicious*." Meaning, when the jury awarded punitive damages, it necessarily found the defendants' conduct was willful. Thus, Judge Whitney concluded that "this 'willful and malicious' conduct is sufficient to support an award of attorneys' fees" for misappropriation of trade secrets.

### Bankruptcy Plan and Confirmation

After obtaining its judgment against the debtor, Bridgetree attempted to force debtor into bankruptcy by an involuntary petition filed October 12, 2012. Hoping to

reorganize its business and continue to litigate with Bridgetree on appeal, debtor acceded. It entered bankruptcy and converted its case to Chapter 11 on October 29, 2012. The reorganization attempt failed. Between the injunction imposed against it in District Court and the loss of a primary customer, debtor was no longer viable. After an abortive attempt to dismiss the case, debtor proposed a liquidating Chapter 11 plan.

Debtor's proposed plan faced intense opposition from a number of adverse parties including Bridgetree. After lengthy negotiations between the parties and several continuances, an eleventh-hour compromise was reached. This accord resulted in a consensual plan that received unanimous approval by the voting creditors. Roselli voted his unsecured claim in favor of the plan.[1]  Doc. 172.

One of the features of that consensual plan was a mutual release between the debtor and its principals, the Rosellis, located in section 7.9 of the amended plan. That release stated:

> ***Release of Estate Claims Against Rosellis and Related Entities***.
> Daniel Roselli and Sara Garces Roselli have General Unsecured Claims in this case totaling $700,000.00 related to loans made by the Rosellis to the Debtor as set forth in the Debtor's Schedules that were filed in this case. Upon information and belief, the Debtor may have certain Causes of Action against the Rosellis and the Related Entities. Upon information and belief, the Rosellis and the Related Entities assert that they have viable defenses to any Causes of Action and that they would litigate any such claims if they were pursued by the Debtor. Rather than incur the expenses and uncertainties associated with litigating any Causes of Action, the Debtor, the Rosellis, and the Related Entities have agreed to resolve the issues on the following terms: (i) the Rosellis shall waive their General Unsecured Claims against the Debtor and the Estate, and (ii) the Debtor and the Estate shall release acquit and forever discharge the Rosellis and the Related Entities, their successors, assigns, agents, insurers, officers, directors, members,

---

[1] No determination was made at that time whether the claim was "allowed" under 11 U.S.C. § 502.

3

> shareholders, employees, administrators, and attorneys and assigns from any and all claims, actions, causes of action, charges, demands, losses, fees and any other damages of every kind, nature and description whatsoever that the Debtor and the Estate ever had, now has, or may have in the future, whether known or unknown against the Rosellis and the Related Entities.

The amended plan, with the release, was confirmed on April 29, 2013 and since consummated. The bar date for filing claims ran on March 19, 2013. Given the release, Roselli failed to file a claim prior to that deadline.

### Cancelation of Bridgetree Judgment as to Roselli Only

Roselli says that at some point he and Bridgetree entered into a confidential settlement agreement. According to Roselli, he paid Bridgetree $250,000 on May 1, 2013 and an additional $1,000,000 on July 23, 2014. Afterward, an order was entered in the Bridgetree action that cancelled the judgment as to Roselli only. Other than the bare allegations set out in Roselli's motion, there is no evidence of this agreement in the record. The terms have not been disclosed to this Court.

### Post Confirmation Adversary Proceedings

After the plan was consummated, the appointed liquidating trustee filed a number of adversary proceedings seeking, *inter alia*, to recover allegedly fraudulent transfers by the debtor made for the benefit of the Rosellis and their other related entities for their personal tax liability, capital calls, and real estate ventures. The Rosellis were named as third-party defendants in several of those adversary proceedings. In a series of motions to dismiss, the Rosellis joined the fraudulent transfer defendants in collaterally attacking the confirmed plan in hope that the plan itself would be wholly revoked. This Court

denied those motions. The third-party actions were dismissed by recommended order dated September 3, 2015 and amended on September 9, 2015.[2]

## Parties' Positions on the Roselli Claim

After his attempt to revoke the confirmed plan was denied and the third-party actions against him were dismissed, Roselli filed the current motion seeking an allowed claim for contribution based on the $1.25 million he says he paid Bridgetree under the confidential agreement. According to Roselli, before his payments, the aggregate amount of the judgment against him and the others for actual and punitive damages and attorneys fees totaled approximately $1,849,891.06 exclusive of some post-judgment interest. Roselli believes that he paid $861,446.99 in excess of his pro rata share of the judgment and is thus entitled to a claim against the debtor for that amount as a matter of right under North Carolina law. He concedes that the claim should be subordinated to Bridgetree's claim in this case (but not necessarily to other claims). Roselli argues that this claim is timely despite being filed after the bar date because the amount owed was not fixed until after the commencement of the bankruptcy case.

Roselli apparently arrived at his $861,446.99 figure by subtracting an amount he says represents his pro rata share of the judgment from the amount he paid to Bridgetree. Roselli asserts his pro rata share of that judgment was not in excess of $371,902.31. An attachment to Roselli's motion shows that he computed his share by taking the total liability owed, divided that amount by five (representing the number of liable parties). In tracing through Roselli's calculations, it is striking that he believes the debtor is liable for

---

[2] The time to object to those proposed findings and conclusions under Bankruptcy Rule 9033 has long since expired and that order is now law of the case.

contribution *for the entire amount* of the alleged overpayment, $861,446.99, and makes no mention of any share owed by the other three parties the jury determined were liable.[3]

The trustee objects to Roselli's request for several reasons. Primarily, the trustee believes Roselli waived all claims against debtor's estate as part of the negotiated release copied above. Alternatively, the trustee argues Roselli's motion should be denied because the claim was not timely filed under the bar date or per the doctrine of laches. Counsel for Bridgetree appeared at the hearing in support of the trustee.

Roselli filed a reply brief the night before the hearing on this matter asserting new positions and arguments. Because that brief was untimely, the Court did not consider it.

**Analysis**

As an initial note, the Court finds the varying positions taken by Roselli over the course of this case puzzling. In 2012 and 2013, Roselli was involved in the contentious and protracted negotiations that resulted in a consensual plan that included the waiver and release. On that occasion, he supported the plan. No doubt, the mutual release was a provision he advocated be included and influenced his vote in favor of the plan. More recently, Roselli, who has apparently become the target of the fraudulent transfer defendants, argued vigorously that the same plan be revoked. He presently wishes to participate as a creditor in the case and receive distributions under the plan, but as recently as a few months ago, he wanted the adversary proceedings against the fraudulent transfer defendants dismissed. Dismissal of those actions could deplete a substantial

---

[3] In addition to RedF and Roselli, the jury found that Mark Epperly, Teng Li, and Target Point, LLC were jointly liable for misappropriation of trade secrets. Roselli was the registered agent for Target Point, and Bridgetree filed an involuntary petition against Target Point on the same day it filed an involuntary petition against the debtor. *See* Case 12-32463, Docs. 1, 5.

source of funds available to pay creditors. Even more curious, Roselli seeks a *subordinated* claim to Bridgetree's claim in a case with over $7,000,000 in allowed general unsecured claims and insufficient assets to pay all unsecured claims in full. At the hearing, counsel for Roselli chalked this motion up to other parties wanting Roselli "to have skin in the game." It never became apparent what that meant. Regardless, Roselli's motion must be denied for several reasons.

The right of contribution arises as a matter of state law and is codified in Chapter 1B of the North Carolina General Statutes. In North Carolina, "where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them." N.C.G.S. § 1B-1(a). However, the state legislature specifically and unequivocally denied the right of contribution to those who *intentionally* caused or contributed to the injury. *Id.* § 1B-1(c) ("There is no right of contribution in favor of any tort-feasor who has intentionally caused or contributed to the injury or wrongful death."); *Holland v. Edgerton*, 355 S.E.2d 514, 519 (N.C. Ct. App. 1987) (holding there is no right to contribution on a claim for intentional infliction of emotional distress because N.C.G.S. § 1B-1(c) "clearly excludes contribution where the tort is intentional").

North Carolina case law imputes a level of culpability to willful acts that is beyond those that are intentional. *E.g.*, *State v. Ramos*, 678 S.E.2d 224, 226 (N.C. 2009) ("Willful is defined as the wrongful doing of an act without justification or excuse, or the commission of an act purposely and deliberately in violation of law. Willfully means something more than an intention to commit the offense." (citations and quotation marks

7

omitted)); *Hancock v. Hancock*, 471 S.E.2d 415, 418 (N.C. Ct. App. 1996) ("Willful has been defined as disobedience which imports knowledge and a stubborn resistance, and as something more than an intention to do a thing. It implies doing the act purposely and deliberately, indicating a purpose to do it, without authority-careless whether [the contemnor] has the right or not-in violation of law . . . . Willfulness involves more than deliberation or conscious choice; it also imports a bad faith disregard for authority and the law." (citations and quotation marks omitted)). Meaning, if one acts willfully, he necessarily was acting intentionally. BLACK'S LAW DICTIONARY (10th ed. 2014) (defining willful as "[v]oluntary and intentional, but not necessarily malicious . . . .The term willful is stronger than voluntary or intentional; it is traditionally the equivalent of malicious, evil, or corrupt.").

In his order awarding attorney fees on the misappropriation of trade secrets claim, Judge Whitney concluded that Roselli's conduct was willful and malicious based on the jury instructions and the jury's subsequent award of punitive damages. *See* N.C.G.S. § 66-154 ("If willful and malicious misappropriation exists, the trier of fact also may award punitive damages in its discretion."). Given that willful conduct requires an intentional act, at the least, Roselli has no contribution right for his purported overpayment per North Carolina law. *Id*. § 1B-1(c) ("There is no right of contribution in favor of any tort-feasor who has *intentionally* caused or contributed to the injury or wrongful death." (emphasis added)). On this basis alone, Roselli's request for an allowed claim in this bankruptcy should be denied.

Even so, for the benefit of a reviewing Court, there are a number of additional reasons that Roselli's request for an allowed claim should be denied. First, in exchange

8

for the release set forth in the confirmed and consummated bankruptcy plan, of which he voted in favor, Roselli agreed to "waive [his] General Unsecured Claims against the Debtor and the Estate." The confirmed plan defines "General Unsecured Claim" as "[a]ny Unsecured Claim, other than an Administrative Claim, an Other Priority Claim, or a Priority Tax Claim." Doc. 69, Art. 1.44. The confirmed plan defines an "Unsecured Claim" as "[a] Claim not secured by a charge against or interest in property in which the Estate has an interest, including . . . any Claim arising at any time under Bankruptcy Rule 3002(c)(3)." Doc. 69, Art 1.65. Finally, Article 1.24 of the confirmed plan defines a "Claim" as "[a]ny right to payment from the Estate, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and arising at any time before the Effective Date or relating to any event that occurred before the Effective Date . . . ." Doc. 69, Art 1.24.

A plain reading of the terms of the confirmed plan make it clear that Roselli seeks a "General Unsecured Claim" against the estate because the requested claim is "a Claim not secured by a charge against or interest in property in which the Estate has an interest" and it is not an "Administrative Claim, an Other Priority Claim, or a Priority Tax Claim." Doc. 69, Arts. 1.65 and 1.44.

While Roselli attempts to couch his purported right of contribution as one which "did not become fixed until after the commencement of the Redf bankruptcy case," the term "Claim" is defined in the confirmed plan. A "Claim" is "[a]ny right to payment from the Estate, whether or not such right is…*fixed, contingent, matured, unmatured*, disputed, undisputed, legal, equitable, secured, or unsecured, and arising at any time

9

before the Effective Date or *relating to any event that occurred before the Effective Date.*" Doc. 69; Art 1.24 (emphasis added).  Thus, it would make no difference whether Roselli's claim was "fixed" as the confirmed plan plainly contemplates such claims are released.  Regardless, the alleged right of contribution stems from payments made to satisfy a judgment entered on August 13, 2012, which was based on events occurring years prior to the effective date.  Likewise, Roselli's payments were ostensibly made pursuant to a confidential settlement agreement that was presumably executed prior to May 2, 2013, the effective date of the confirmed plan.  Thus, his claim would fall into the net of those claims waived per the terms of the confirmed plan.[4]

To conclude otherwise would require a contorted reading of the plain language of the confirmed plan and permit Roselli to enjoy the release's protections while avoiding the hardships of the agreed waiver.  As made clear by Bridgetree at the hearing on this matter, permitting Roselli to receive a claim in this case was not part of the bargain agreed to by Roselli and the debtor's creditors.  That should come as no surprise as Roselli's misdeeds, which Judge Whitney called "willful and malicious," led to the multi-million dollar Bridgetree judgment and the resulting bankruptcy in which unsecured creditors are likely to receive mere pennies on the dollar.

Even if Roselli could assert a right to contribution under state law and even if the confirmed plan did not waive the claim he now asserts, Roselli has failed to put forth sufficient evidence to support allowance of a claim in this case.

The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim.  *In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir.

---

[4] Having waited over two and a half years after the bar date to file his claim, Roselli's claim is also untimely and should be denied.

2004) (citing 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f)). The burden then shifts to the objecting party to introduce evidence to rebut the claim's presumptive validity. *Id*. (citations omitted). If met, the claimant must ultimately prove the amount and validity of a claim by a preponderance of the evidence. *Id*. (citations omitted).

However, that burden is heightened when the claimant is an "insider" of the debtor. *Id*. at 640-41 (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)). Per 11 U.S.C. § 101(31)(B), Roselli is an insider which is defined as a "director of the debtor; officer of the debtor; person in control of the debtor; partnership in which the debtor is a general partner; general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor." Because of the influence and control an insider may wield, an insider's transactions with a debtor are subject to "rigorous" or "strict" scrutiny. *Harford Sands*, 372 F.3d at 640 (citing *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991); *Brewer v. Erwin & Erwin, P.C.*, 942 F.2d 1462, 1465 (9th Cir. 1991); *In re Inter-Island Vessel Co., Inc.*, 98 B.R. 606, 608-09 (Bankr. D. Mass. 1988)). Meaning, Roselli must "show the inherent fairness and good faith of the challenged transaction." *Harford Sands*, 372 F.3d at 640 (citation omitted). On this record, he has not met this heightened standard and would not prevail under the lesser standard either.

To illustrate, Roselli's claim is premised entirely on his characterization of a deal between he and Bridgetree that resulted in a U.S. District Court consent order cancelling the judgment as to Roselli only. That confidential settlement has neither been revealed to this Court nor introduced into the evidentiary record of this case. In fact, the parties have not so much as referenced its terms, leaving this Court in the dark as to what was agreed

11

upon (if anything). Bridgetree's staunch opposition to allowing Roselli a claim in this case suggests that further evaluation of the settlement is needed before a claim could be allowed based upon payment under the settlement.

Furthermore, Roselli believes the debtor is liable for contribution *for the entire amount* of the alleged overpayment, $861,446.99, and makes no mention of any share owed by the other three parties the jury determined were jointly liable, one of which is an entity he controlled. Roselli argues that he should not bear more than an aliquot share of liability; yet, he would ask the debtor (ultimately the creditors who were innocent parties to the Bridgetree action) to bear much more than its share. Roselli glosses over this point and makes no mention of why the debtor should shoulder the burden for the other joint tortfeasors.

In conclusion, Roselli's request for an allowed claim in this case must be denied. Roselli's willful and malicious conduct that led to an award of punitive damages for misappropriation of trade secrets extinguished his state law rights to contribution. Alternatively, the confirmed plan precludes Roselli from asserting a contribution claim in this case. And, as a second alternative, Roselli, an insider, has failed to show the inherent fairness and good faith of the transaction that led to his purported contribution rights.

**SO ORDERED.**

**This Order has been signed electronically.**  **United States Bankruptcy Court**
**The judge's signature and the court's seal**
**appear at the top of the Order.**